**STATE OF COLORADO, ex rel. COLORADO STATE BANKING BOARD; Independent Bankers of Colorado, a non-profit corporation, Plaintiffs–Appellees,**

v.

**RESOLUTION TRUST CORPORATION, an agency of the United States; Federal Deposit Insurance Corporation, an agency of the United States and; Robert L. Clarke, in his official capacity as the Comptroller of the currency of the United States, Defendants–Appellants.**

**CONFERENCE OF STATE BANK SUPERVISORS; Independent Bankers Association of America, Amicus Curiae.**

**State of Colorado, ex rel. Colorado State Banking Board; Independent Bankers of Colorado, a non-profit corporation, Plaintiffs–Appellees,**

v.

**RESOLUTION TRUST CORPORATION, an agency of the United States; Federal Deposit Insurance Corporation, an agency of the United States, Defendants,**

**and**

**Robert L. Clarke, in his official capacity as the Comptroller of the currency of the United States, Defendant–Appellant.**

**Conference of State Bank Supervisors; Independent Bankers Association of America, Amicus Curiae.**

**INDEPENDENT COMMUNITY BANKERS ASSOCIATION OF NEW MEXICO, a non-profit New Mexico corporation; Plaintiff–Appellant,**

**The State of New Mexico, the Financial Institutions Division, Plaintiff–Intervenor–Appellant,**

v.

**RESOLUTION TRUST CORPORATION, an agency of the United States; Federal Deposit Insurance Corporation, an agency of the United States and; Robert L. Clarke, in official capacity as Comptroller of the currency of the United States, Defendants–Appellees.**

State of Colorado; Independent Bankers of Colorado, a Colorado non-profit corporation; Conference of State Bank Supervisors; Independent Bankers Association of America, Amicus Curiae.

Nos. 90–1276, 90–1279 and 90–2107.

United States Court of Appeals, Tenth Circuit.

Feb. 11, 1991.

Rehearing Denied March 25, 1991.

Ann Southworth, Dept. of Justice, Washington, D.C. (L. Robert Griffin, Director, Litigation Division and Caren S. Hersh, Atty., Office of the Comptroller of the Currency, Washington, D.C., of counsel, Stuart M. Gerson, Asst. Atty. Gen., William L. Lutz, Michael J. Norton, U.S. Attys., and Douglas N. Letter, Dept. of Justice, Washington, D.C., with her on the briefs), for Comptroller of the Currency of the U.S.

Dorothy L. Nichols, Associate Gen. Counsel, Federal Deposit Ins. Corp., Washington, D.C. (Alfred J.T. Byrne, Gen. Counsel, Ann S. DuRoss, Asst. Gen. Counsel, and Thomas D. Holzman, Federal Deposit Ins. Corp., Washington, D.C., John H. Bernstein and Diana C. Fields, Kutak Rock & Campbell, Denver, Colo., Michael E. Tucci, Sr. Counsel and Robert A. Ward, Counsel, Resolution Trust Corp., Denver, Colo., with her on the briefs), for The Resolution Trust Corp. and the Federal Deposit Ins. Corp.

I. Thomas Bieging, McKenna & Cuneo, Denver, Colo. (Stephen B. Shapiro, McKenna & Cuneo, Denver, Colo., Barbara M.A. Walker, First Asst. Atty. Gen. and Sherrie D. Vincent, Asst. Atty. Gen. for the Atty. Gen. Regulatory Law Section, Denver, Colo., with him on the briefs), for Independent Bankers of Colorado and State of Colorado, ex rel. Colorado State Banking Bd.

Leonard J. Rubin, Bracewell & Patterson, Washington, D.C. (Virginia E. O'Neill and Ellen C. Starr, Bracewell & Patterson, Washington, D.C., for Independent Community Bankers Ass'n of New Mexico, G.T.S. Khalsa and Jonathan L. Barela, Office of the Atty. Gen., Santa Fe, N.M., for State of N.M., Financial Institutions Div., with him on the briefs).

Before ANDERSON, BALDOCK, and EBEL, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

This appeal consists of two cases challenging a Resolution Trust Corporation ("RTC") regulation, 55 Fed.Reg. 22,323

(1990) (to be codified at 12 C.F.R. § 1611.1) (the "Override Regulation"), allowing banks that acquire failed or failing savings and loan associations ("thrifts") to operate the thrifts' offices [1] as bank branches, notwithstanding state laws that would prohibit the acquiring bank from operating such branches. We are confronted with a split between two district courts within the Circuit. The State and Independent Community Bankers of New Mexico appeal a New Mexico district court order upholding the Override Regulation as a valid exercise of the RTC's statutory rulemaking authority. The RTC appeals a Colorado district court order holding that the Override Regulation is void and contrary to the authorizing statute. We respectively affirm and reverse.

## BACKGROUND

In response to the savings and loan crisis, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). Pub.L. No. 101–73, 103 Stat. 183 (1989). In FIRREA, Congress created the RTC and granted it the same conservatorship, receivership, and assistance powers and duties the FDIC possesses. 12 U.S.C. § 1441a(b)(4).[2] Congress also granted the RTC broad authority to "issue such rules, regulations, standards, policies, procedures, guidelines, and statements" as it "considers necessary or appropriate to carry out" its statutory purpose. 12 U.S.C. § 1441a(b)(12)(A). That purpose, simply put, is to "contain, manage, and resolve failed savings associations." FIRREA § 101(7), 103 Stat. at 187. FIRREA instructs the RTC to accomplish this objective "in a manner which maximizes the net present value return from the sale or other disposition of [failed] institutions," and "minimizes the amount of any loss realized in the resolution of cases." 12 U.S.C. § 1441a(b)(3)(C)(i), (iv).

Relying upon this instruction, and the language of 12 U.S.C. § 1823(k), the RTC has interpreted FIRREA as authorizing it to override state branch banking laws preventing banks that acquired failed or failing thrifts in emergency acquisitions under FIRREA to retain and operate the thrifts' offices as bank branches. The RTC published a notice of its intent to adopt a rule (the Override Regulation) formalizing this statutory authorization. 55 Fed.Reg. 13,-543 (proposed April 11, 1990). After considering comments, the RTC Board of Directors adopted the Override Regulation, which was published in the Federal Register as a final rule, effective June 1, 1990.

The Override Regulation provides, in pertinent part:

### § 1611.1 Retention of thrift branches acquired by banks

(a) Purpose. (1) Section 13(k) of the Federal Deposit Insurance Act (12 U.S.C. 1823(k)) ... grants to the RTC the power to authorize emergency acquisitions of failed or failing savings associations. Under section 13(k), the RTC may authorize such acquisitions notwithstanding any provision of State law, upon making a determination that severe financial conditions threaten the stability of a significant number of savings associations, or savings associations possessing significant financial resources, and a determination that such authorization would lessen the risk to the RTC. Authorizations of acquisitions of State-chartered savings associations are subject to prior RTC consultation with State officials and a vote of 75 percent of the voting members of the RTC Board of Directors to authorize such acquisitions over objection of State officials.

(2) The regulations of this section provide for the retention and operation by acquiring banks of the offices of savings associations acquired pursuant to section 13(k).

(b) Each existing office or other existing facility of each savings association that is merged or consolidated with, or

---

**1.** Designating the thrifts' offices as "branches" fails to account for the thrifts' main offices. We uniformly refer to a thrift's main and branch offices as its "offices."

**2.** Where applicable, we uniformly cite to the U.S.C. sections codifying FIRREA, rather than to the Act itself.

the assets and liabilities of which are transferred to, an insured bank pursuant to section 13(k) may be retained by the insured bank and operated by the bank as a branch or other facility.

55 Fed.Reg. 22,323 (1990) (to be codified at 12 C.F.R. § 1611.1).

On May 24, 1990, First National Bank in Albuquerque ("First National") submitted a bid to purchase certain assets and liabilities of New Mexico Federal, a failed thrift in RTC conservatorship, including New Mexico Federal's main office in Albuquerque and its branch offices in Santa Fe, Taos, and Espanola. First National's bid was expressly contingent upon RTC override of New Mexico state branch banking law, which would not permit First National to operate branches at the locations of New Mexico Federal's offices.[3] On May 30, 1990, the RTC notified New Mexico of its intent to override New Mexico's branch banking laws pursuant to its proposed acceptance of First National's bid.

On June 1, 1990, the Independent Community Bankers of New Mexico[4] filed suit against the RTC, the Federal Deposit Insurance Corporation ("FDIC"),[5] and the Comptroller of the Currency ("Comptroller"),[6] challenging the legality of the Override Regulation and its application in New Mexico. On the same day, the Financial

Institutions Division of the State of New Mexico[7] intervened as a plaintiff. On June 5, 1990, the Board of Directors of the RTC unanimously approved First National's bid for New Mexico Federal and authorized the override of New Mexico branch banking law. The State and Community Bankers of New Mexico filed motions for a temporary restraining order and preliminary injunction. The RTC, FDIC, and Comptroller moved to dismiss the complaint for failure to state a claim upon which relief could be granted. The district court heard argument on the motions and on June 15, 1990, dismissed the complaint and held that the Override Regulation is a "reasonable, permissible, and plausible" interpretation of FIRREA. R.Vol. I, Tab 39, at 14.

Before the Override Regulation was adopted, a similar RTC transaction was challenged in Colorado. In December, 1989, or January, 1990, Mesa National Bank ("Mesa National") submitted a bid for Valley Federal Savings & Loan Association ("Valley") and Mesa Federal Savings & Loan Association ("Mesa Federal"), both in RTC conservatorship. Mesa National bid $675,000, contingent on retaining and operating the former thrift offices as a bank office and branches, which was not permitted by Colorado Law.[8] The RTC approved Mesa National's proposal in January, 1990. The State[9] and Independent

3. New Mexico essentially limits bank branching to within the same county. N.M.Stat.Ann. § 58-5-3 (1986 Repl.). Branching into an adjoining county or within 100 miles is permissible only if no competing banks are located in the proposed branch location.

4. The Independent Community Bankers of New Mexico is a New Mexico nonprofit corporation representing the interests of its twenty-seven commercial bank members located throughout the State of New Mexico.

5. The FDIC exclusively manages the RTC. 12 U.S.C. § 1441a(b)(1)(C).

6. Robert L. Clarke is the Comptroller of the Currency and was sued in his official capacity. The Comptroller is the chief officer of a Department of the Treasury bureau known as the Office of the Comptroller of the Currency. *See* 12 U.S.C. § 1. The Comptroller is charged by law with the administration of the National Bank Act. *See* 12 U.S.C. § 1, *et seq.* He is

responsible for chartering national banking associations and approving their applications for permission to establish branch banking offices. 12 U.S.C. § 21.

7. The Financial Institutions Division of the State of New Mexico executes state laws governing the organization, inspection, supervision, liquidation, and dissolution of various depository institutions, including banks.

8. Colorado law only permits bank branching in extremely limited circumstances, inapplicable to this case. Colo.Rev.Stat. § 11-6-101 (1987 Repl.).

9. In particular, the Colorado State Banking Board. The Banking Board is the Colorado agency empowered to administer and enforce the state's banking statutes. It governs the activities—including mergers, consolidations, and transfers of assets—of corporations operating as banks. Colo.Rev.Stat. § 11-2-103 (1987 Repl.).

Bankers of Colorado [10] filed for declaratory and injunctive relief to prevent the override of Colorado branch banking law. On February 4, 1990, the district court entered a Temporary Restraining Order, and the RTC was forced to restructure the transaction with Mesa National. Faced with individually chartering and capitalizing the former thrift offices as separate banks, Mesa National reduced its bid to $75,000.

When the Override Regulation was adopted in June, 1990, Colorado and the Independent Bankers challenged its validity. On September 7, 1990, upon cross-motions for summary judgment, the district court held in favor of Colorado and the Independent Bankers and declared the Override Regulation void. The Colorado district court noted the pendency of the New Mexico appeal and recommended that the cases be considered together. All parties agreed, and we expedited this appeal.

### I. The *Chevron* Standard of Review

The States [11] assert that FIRREA does not authorize the RTC to override state branch banking law. Our standard of review is well-established:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or

ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (footnotes omitted), *reh'g denied*, 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984). *See also Utah Power & Light Co. v. Secretary of Labor*, 897 F.2d 447, 449–50 (10th Cir.1990); *Quivira Mining Co. v. United States Nuclear Regulatory Comm'n*, 866 F.2d 1246, 1249 (10th Cir.1989); *Mustang Energy Corp. v. F.E.R.C.*, 859 F.2d 1447, 1452–53 (10th Cir. 1988) ("We will defer when an agency has chosen between alternative possible constructions of an ambiguous statute."), *cert. denied*, 490 U.S. 1019, 109 S.Ct. 1743, 104 L.Ed.2d 180 (1989).

Thus, if Congress has directly spoken to the precise question whether the RTC may, pursuant to FIRREA, override state branch banking law, we give effect to Congress's unambiguously expressed intent. If, however, we determine that Congress did not clearly express its will, i.e., if FIRREA is either silent or ambiguous with regard to the RTC's authority to override state branch banking law, then we must determine whether the RTC's interpretation of FIRREA is "permissible."

The relevant provision of FIRREA is codified at 12 U.S.C. § 1823(k).[12] The two critical subsections are (k)(1) and (k)(4). Subsection (k)(4), which ostensibly discusses branching, is intractably ambiguous and contains no clear expression of congressional intent. Subsection (k)(1), however, expresses clear congressional authorization for the RTC to override state branch banking law. In order to give effect to the intent unambiguously expressed in subsection (k)(1), we uphold the Override Regula-

---

**10.** Independent Bankers of Colorado is a nonprofit corporation representing approximately 170 commercial banks in Colorado.

**11.** In this opinion, "the States" is a shorthand designation for appellants, the State and Community Bankers of New Mexico, and appellees, the State and Independent Bankers of Colorado.

**12.** It is section 217(k) of FIRREA, and adds a new subsection (k) to section 13 of the Federal Deposit Insurance Act. As a result, this crucial provision is variously referred to by parties and courts as section 217(k), section 13(k), and 12 U.S.C. § 1823(k). We uniformly refer to the U.S.Code citation.

tion as a valid exercise of the RTC's statutory authority.

## II. Section 1823(k)(1)

Section 1823(k)(1) authorizes the RTC to "resolve" failed savings associations through "emergency acquisitions." It provides, in pertinent part:

(k) Emergency Acquisitions

(1) In general

(A) Acquisitions authorized

(i) Transactions described

*Notwithstanding any provision of State law*, upon determining that severe financial conditions threaten the stability of a significant number of savings associations, or of savings associations possessing significant financial resources; *the Corporation, in its discretion* and if it determines such authorization would lessen the risk to the Corporation, *may authorize* —

(I) *a savings association* that is eligible for assistance pursuant to subsection (c) of this section *to merge or consolidate with, or to transfer its assets and liabilities to,* any other savings association or *any insured bank,*

(II) any other savings association to acquire control of such savings association, or

(III) any company to acquire control of such savings association or to acquire the assets or assume the liabilities thereof.

The Corporation may not authorize any transaction under this subsection unless the Corporation determines that the authorization will not present a substantial risk to the safety or soundness of the savings association to be acquired or any acquiring entity.

(ii) Terms of transactions

*Mergers, consolidations, transfers, and acquisitions under this subsection shall be on such terms as the Corporation shall provide*

\* \* \* \* \* \*

(vi) Continued applicability of certain state restrictions

Nothing in this subsection overrides or supersedes State laws restricting or limiting the activities of a savings association on behalf of another entity.

12 U.S.C. § 1823(k)(1)(A)(i), (ii), (vi) (emphasis added).

Under § 1823(k)(1), the RTC may authorize an eligible savings association "to merge or consolidate with, or to transfer its assets and liabilities to, any other savings association or any insured bank." 12 U.S.C. § 1823(k)(1)(A)(i)(I). The statute states that these transactions should be effectuated "[n]otwithstanding any provision of state law," 12 U.S.C. § 1823(k)(1)(A)(i), and "on such terms as the Corporation [the RTC] shall provide." 12 U.S.C. § 1823(k)(1)(A)(ii).

This language grants the RTC broad authority to override state law that interferes with the enumerated emergency acquisitions. The Senate Report on FIRREA confirms that § 1823(k)(1)'s override provision "can be used to override *all State law* (including State constitutions), *with one exception.*" S.Rep. No. 19, 101st Cong., 1st Sess. 320 (1989) (emphasis added). That single exception is found in subparagraph (A)(vi), which provides that the RTC cannot override or supersede "State laws restricting or limiting the activities of a savings association on behalf of another entity."

The States draw a distinction between state law governing § 1823(k)(1)'s enumerated acquisitions, and state law governing post-acquisition operating activities. They argue that the RTC's override authority under § 1823(k)(1) only extends to the former, and that state branch banking law governs the latter.

The distinction finds no support in the statute. Subsection (k)(1) says: "Notwithstanding *any* provision of State law" (emphasis added). Moreover, the sole category of state law excepted from RTC override authority is a kind of post-acquisition, operating law: law governing certain *activities* of savings associations. 12 U.S.C. § 1823(k)(1)(A)(vi). If "notwithstanding any State law" means "notwithstanding any State law governing acquisition of a savings association," Congress would not

need to except a category of post-acquisition, operating law in subparagraph (A)(vi). Instead of distinguishing between acquisition and operation, the statute focuses on whether a state law impedes the enumerated acquisition. If it does, the statute authorizes the RTC to override it.

State branch banking laws impede emergency acquisitions. As the RTC points out, in a merger between a failing thrift and a healthy bank, the resulting entity will be a bank. The entity's branches become, by definition, bank branches. State law that prevents them from operating as bank branches impedes the merger. This is also true of a consolidation or transfer of assets and liabilities. In a transfer, if the acquiring entity is a bank, the acquired thrift's assets and liabilities, including its offices, will belong to the bank. If state law prevents them from operating as bank branches, it frustrates the purpose of the transfer.

The States, joined by the dissent, suggest that state branch banking laws do not impede the enumerated acquisitions because an acquiring bank need not operate former thrift offices as bank branches. Instead, they suggest, banks may operate the former thrift offices as thrift subsidiaries or independently chartered and capitalized banks.

While it is true that, under the statute, banks have these options, they are not *required* to pursue them. Some banks, for unique reasons, may *choose* to operate the acquired offices as thrift subsidiaries or as independently chartered and capitalized banks, but these choices are not the logical or likely result of the acquisition. The bank's most compelling motive for the transaction is to acquire the thrift's deposit base and accompanying customer business. The deposits and the business are intertwined with the acquired thrift's place of business. In fact, to say that the bank may acquire the deposits but cannot have access to the depositors is to effectively deny, or at least drastically limit, the acquisition.[13]

■ Section 1823(k)(1) does not condition mergers between banks and failing thrifts upon subsequent divestiture of all the acquired thrift's offices. Such an interpretation of § 1823(k)(1) robs the term "merger" of its most basic meaning. *Black's Law Dictionary* defines merger of corporations as

[a]n amalgamation of two corporations pursuant to statutory provision in which one of the corporations survives and the other disappears. The absorption of one company by another, the former losing its legal identity, and latter retaining its own name and identity and acquiring assets, liabilities, franchises, and powers of former, and absorbed company ceasing to exist as a separate business entity.

*Black's Law Dictionary* 988 (6th ed. 1990). As the definition suggests, in the mergers under § 1823(k), the failing thrifts are absorbed into banks; they cease to exist as thrifts.

At oral argument, the States asserted that "merger" is used in the statute as a term of art and does not carry its ordinary meaning. Nothing in the statute supports this assertion. To the contrary, substantial evidence suggests that the term "merger" retains its accepted meaning in banking regulations.[14] In fact, nowhere in the fed-

---

**13.** In both the cases combined in this appeal, the prospective purchasers conditioned their bids upon retention of the failed thrifts' offices. In Colorado, when this possibility was precluded by the district court's Temporary Restraining Order, Mesa National reduced its bid by nearly 90%.

**14.** 12 U.S.C. § 215a, for example, governs the merger of national banks with state or other national banks. Section 215a(e) provides:

The corporate existence of each of the merging banks or banking associations participating in such merger shall be merged into

and continued in the receiving association and such receiving association shall be deemed to be the same corporation as each bank or banking association participating in the merger. All rights, franchises, and interests of the individual merging banks or banking associations in and to every type of property (real, personal, and mixed) and choses in action shall be transferred to and vested in the receiving association by virtue of such merger without any deed or other transfer. The receiving association, upon the merger and without any order or other action on the

eral regulatory scheme governing depository institutions have we found any indication that the term "merger" possesses a special meaning.[15]

The dissent states that it is the *RTC's* definition of "merger" that is "unique." Dissenting Opinion at 952. In support of this proposition, it points out that a merger *may* be accompanied by divestiture. No one disputes this obvious and irrelevant fact.[16] The question is whether, in § 1823(k)(1), Congress used the term "merger" to mean "merger, but, in those states with branch banking restrictions, merger followed by immediate divestiture." We find no indication that Congress intended such a selective application of the term. Far from incorporating state law, § 1823(k)(1) says "Notwithstanding state law."

■ Of course, the emergency acquisitions authorized in this case were not mergers but transfers of assets and liabilities. The effect of a transfer, however, is the same: the acquired thrifts ceased to independently exist; their assets, including their offices, were transferred to banks. Moreover, section (k)(1) does not limit its authorization of transfers to situations where the bank holds the acquired offices as thrift subsidiaries or independently charters and capitalizes them as banks. We will not read the statute as imposing such an artificial limitation; and if state law imposes such a limitation, the RTC is authorized to override it.

The dissent argues that a literal interpretation of the RTC's override authority in § 1823(k)(1) is dangerously broad and would allow the RTC to override virtually any state law that made an emergency acquisition less attractive, including zoning, environmental and criminal laws. This is simply not the case. According to its legislative history, "Section 215 [§ 1823(k)] permits an override of the laws of any State that constitute *a material impediment to supervisory acquisitions.*" H.R.Rep. No. 54, 101st Cong., 1st Sess. 336, *reprinted in* 1989 U.S.Code Cong. & Admin.News 86, 132 (emphasis added). Laws of general applicability that merely make an emergency acquisition less attractive are not "material impediments."

A zoning restriction, for example, that prevented the construction of extra lanes for drive-up tellers at a given thrift branch

part of any court or otherwise, shall hold and enjoy all rights of property, franchises, and interests ... in the same manner and to the same extent as such rights, franchises, and interests were held or enjoyed by any one of the merging banks or banking associations at the time of the merger....

12 U.S.C. § 215a(e) ("Receiving association" is defined in § 215b(4) as the "national banking association into which one or more national banking associations or one or more State banks, located within the same State, merge."). *See also Ellis v. State Nat'l Bank of Alabama,* 434 F.2d 1182, 1186–1188 (5th Cir.1970) (reviewing § 215a and concluding that "Congress intended and advisedly used the terms consolidation and merger in their strict technical sense"), *cert. denied,* 402 U.S. 973, 91 S.Ct. 1661, 29 L.Ed.2d 137 (1971).

15. *See* 12 C.F.R. § 546.1, 546.2(b) (regulation governing mergers of federal savings associations); 12 C.F.R. § 708.1(a), (b) (regulation governing mergers of federally insured credit unions).

16. We *do* dispute the dissent's characterization of the case law. The dissent incorrectly cites *Reibert v. Atlantic Richfield Co.,* 471 F.2d 727 (10th Cir.), *cert. denied,* 411 U.S. 938, 93 S.Ct.

1900, 36 L.Ed.2d 399 (1973), for the proposition that a transaction was viewed as a merger even though the *surviving entity* was forced to divest itself of certain properties. Dissenting Opinion at 952. In reality, the proposed merger was "temporarily halted" until the merging entity [Sinclair Oil] divested itself of properties which presented potential antitrust violations. 471 F.2d at 728. "Once the court accepted Sinclair's divestiture, the merger was consummated." *Id.* In the other case, two potential merging partners similarly assured a court that "in implementing the consolidation they would divest themselves" of branch offices presenting "antitrust difficulties." *United States v. Connecticut Nat'l Bank,* 418 U.S. 656, 659, 94 S.Ct. 2788, 2791, 41 L.Ed.2d 1016 (1974).

The cited cases underscore the RTC's definition of "merger." They both reflect the underlying assumption that, without judicial intervention, the resulting entity possesses all of the merging entity's assets. In both cases, the courts *limited* the proposed mergers because their natural result would have violated federal antitrust law. Because of the potential violations, the parties agreed in advance to divest themselves of the problematic assets, and thus alter the expected result of the mergers.

location might make it less attractive for a bank to purchase the thrift in an emergency acquisition, but it would not materially impede the acquisition. In contrast, a zoning restriction that allowed only thrifts and not banks to occupy the location would be a "material impediment" to the acquisition. Indeed, such a law would effectively prevent the acquisition. Under the statute, such a significant barrier to the bank's acquisition of the thrift could be overridden by the RTC.[17]

In support of their argument that § 1823(k)(1) was not intended to allow the RTC to override state branch banking law, the States cite two legislators' comments in the Congressional Record.[18] We do not find these comments persuasive.

In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which "represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." *Zuber v. Allen,* 396 U.S. 168, 186 [90 S.Ct. 314, 324, 24 L.Ed.2d 345] (1969). We have eschewed reliance on the passing comments of one Member, *Wein-*

*berger v. Rossi,* 456 U.S. 25, 35 [102 S.Ct. 1510, 1517, 71 L.Ed.2d 715] (1982), and casual statements from the floor debates. *United States v. O'Brien,* 391 U.S. 367, 385 [88 S.Ct. 1673, 1683, 20 L.Ed.2d 672] (1968); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 [100 S.Ct. 2051, 2056, 64 L.Ed.2d 766] (1980). *Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 483, 83 L.Ed.2d 472 (1984), *reh'g denied,* 469 U.S. 1230, 105 S.Ct. 1235, 84 L.Ed.2d 371 (1985); *see also Arkansas State Bank Comm'r v. Resolution Trust Corp.,* 911 F.2d 161, 174–75 (8th Cir.1990). The cited statements from single members of Congress do not square with the congressional intent expressed in the House and Senate Reports.[19]

Moreover, the cited statements do not refer to § 1823(k), or even emergency acquisitions; they refer to conversions. While emergency acquisitions are one kind of conversion under FIRREA, 12 U.S.C. § 1815(d)(2), they are only a small subset of conversions. Even if Congress did not intend all savings associations that converted to banks to retain their former branches as bank branches, Congress could still provide a specific exception with regard to

17. Moreover, the dissent's implausible hypotheticals bear no relation to the actual appeal before us, which involves two states' banking laws directly related to the essence of the acquisition.

18. The following dialogue took place in the Senate:

> Mr. WIRTH: Mr. President, I seek recognition to inquire about certain provisions contained in the savings and loan conference report now before the Senate. I would like to ask the distinguished chairman of the Banking Committee, Senator RIEGLE, to clarify provisions in the legislation concerning the conversion of thrift charters to bank charters.
> Is it correct that the provisions of this act that permit thrifts to be converted to banks are not intended to allow banks resulting from such conversions to establish, retain, maintain, or operate branches that do not comply with the laws relative to the establishment and operation of bank branches or offices in the respective States where such banks are located?
> Mr. RIEGLE: The Senator's statement is correct.

135 Cong.Rec. S10,200 (daily ed. August 4, 1989).

Congressman Leach of the House Banking Committee repeated the same words in the House:

> As for specific provisions of the conference report, the record should be clear on the following items:
> First, that provisions of this act that permit thrifts to be converted to thrifts [sic] are not intended to allow banks resulting from such conversions to establish, retain, maintain, or operate branches that do not comply with the laws relative to establishment and operation of bank branches or offices in the respective States where such banks are operated.

135 Cong.Rec. H4980 (daily ed. August 3, 1989).

19. The House Report states that § 1823(k) "permits an override of the laws of any State that constitute a material impediment to supervisory acquisitions." H.R.Rep. No. 54, 101st Cong., 1st Sess. 336, *reprinted in* 1989 U.S.Code Cong. & Admin.News 86, 132. The Senate Report states that the § 1823(k) "can be used to override all State law (including State constitutions), with one exception" not involving state branch banking laws. S.Rep. No. 19, 101st Cong., 1st Sess. 320 (1989).

emergency acquisitions. Subsection (k)(1)'s plain language indicates that they did.

In sum, § 1823(k)(1) provides an express statutory grant of authority in support of the Override Regulation.[20] It authorizes enumerated emergency acquisitions "notwithstanding any provision of State law." State branch banking laws materially impede these acquisitions. In fact, they thwart the very purpose of the acquisitions. Nothing in § 1823(k)(1) indicates that Congress intended to exempt state branch banking law from this override authority. It is not this court's prerogative to alter that decision.

### III. Section 1823(k)(4): The Branching Provision

Section 1823(k)(4) states in full:

(4) Branching provisions

(A) In general

If a merger, consolidation, transfer, or acquisition under this subsection involves a savings association eligible for assistance and a bank or bank holding company, a savings association may retain and operate any existing branch or branches or any other existing facilities. If the savings association continues to exist as a separate entity, it may establish and operate new branches to the same extent as any savings association that is not affiliated with a bank holding company and the home office of which is located in the same state.

(B) Restrictions

(i) In general

Notwithstanding subparagraph (A), if—

(I) a savings association described in such subparagraph does not have its home office in the State of the bank holding company bank subsidiary, and

(II) such association does not qualify as a domestic building and loan association under section 7701(a)(19) of Title 26, or does not meet the asset composition test imposed by subparagraph (C) of that section on institutions seeking so to qualify,

such savings association shall be subject to the conditions upon which a bank may retain, operate, and establish branches in the State in which the Savings Association Insurance Fund member is located.

(ii) Transition Period

The Corporation, for good cause shown, may allow a savings association up to 2 years to comply with the requirements of clause (i).

12 U.S.C. § 1823(k)(4).

The apparent purpose of § 1823(k)(4) is to address the retention of existing offices and the creation of new branches after an emergency acquisition. There are, of course, only two potentially resulting entities: a savings association, or a bank.[21] Our task is to determine if subsection (k)(4) clearly addresses whether a resulting bank may retain and operate acquired thrift offices as bank branches.[22]

Both sides claim that the provision clearly addresses this question. The States assert that subsection (k)(4) clearly prohibits resulting banks from retaining and operating acquired thrift offices as bank branches. The RTC asserts that subsection (k)(4) clearly authorizes resulting banks to retain and operate acquired thrift offices as bank

---

**20.** Needless to say, we find no support for the dissent's assertion that (k)(1) demonstrates a clear congressional intent to *forbid* the Override Regulation. Even if we were to find that subsection (k)(1) is silent or ambiguous with regard to the Override Regulation, we still must defer to a permissible construction of (k)(1) by the RTC. *See* Section IV below.

**21.** Of course, the savings association may be a subsidiary of a bank holding company, and the statute takes this possibility into consideration.

**22.** If Congress clearly addresses the issue in this subsection, then (k)(4) governs, regardless of subsection (k)(1)'s override authority. If, however, subsection (k)(4) is silent or ambiguous, we must give effect to Congress's clear intent, as

branches.[23] Neither is correct. Subsection (k)(4) expresses nothing very clearly. It is confusing, and amenable to several plausible constructions.

The language upon which all the interpretations pivot is found in the first sentence of subparagraph (A): "a savings association may retain and operate any existing branch or branches or any other existing facilities."

### A. *The States' Interpretation*

The States assert this language clearly means that "only a resulting savings association may retain and operate any existing branch." We disagree. While this construction is plausible, it is only one interpretation of the statute. The plain language of the statute does *not* say *"only a resulting* savings association may retain existing branches." Such an interpretation requires addition of the two underlined words, each of which represents an interpretive conclusion.

Addition of the word "only" concludes, by negative implication, that because the statute allows savings associations to retain existing offices, it does not allow banks to retain existing offices. To support this conclusion, the States point out that the FIRREA's definition of "savings association" excludes banks.[24] But adopting this reasoning would suggest that every FIRREA provision that subjects savings associations to a given requirement necessarily exempts banks from the requirement, a plainly false conclusion.

Addition of the word "resulting" concludes that the reference to savings associ-

expressed in subsection (k)(1), to allow the RTC to override state law. *See* Section IV below.

23. In the alternative, the RTC asserts that the provision is at least silent on this question.

24. FIRREA provides:
The term "savings association" means:
(A) any Federal savings association;
(B) any State savings association; and
(C) any corporation (other than a bank) that the Board of Directors and the Director of the Office of Thrift Supervision jointly determine to be operating in substantially the same manner as a savings association.
12 U.S.C. § 1813(b).

ation describes a post-transaction savings association. While it may, it is not clear that it does. The reference to "savings association" at issue is the second of four such references to the term in subparagraph (A). Examining the other references to savings association sheds light on the second reference's meaning.

If a merger, consolidation, transfer, or acquisition under this subsection involves a *savings association* eligible for assistance and a bank or bank holding company, a *savings association* may retain and operate any existing branch or branches or any other existing facilities. If the *savings association* continues to exist as a separate entity, it may establish and operate new branches....

12 U.S.C. § 1823(k)(4)(A).

The first reference to "savings association" describes a *pre*-transaction entity—it is only *eligible* to be acquired. Examined in context, the third reference to "savings association" also describes a pre-transaction entity.[25] The conditional phrase in which the third reference occurs, "If the savings association continues to exist as a separate entity," encompasses the possibility that the savings association may *not* continue to exist as a separate entity. It may become something else, namely, a bank. To clearly indicate a post-transaction entity, Congress could have said, "If the *resulting* entity is a savings association, it may...." Instead, Congress used the term "savings association." Congress meant the pre-transaction savings association, more specifically, "the entity that began as a savings association."[26]

25. This third reference is typically interpreted as clearly describing a post-transaction entity. *Arkansas State Bank Comm'r v. Resolution Trust Corp.*, 911 F.2d 161, 170 (8th Cir.1990). Those who have reached this conclusion have relied on the phrase immediately following "savings association": "continues to exist as a separate entity." We think this phrase requires the opposite conclusion.

26. Thus, subparagraph (A)'s second sentence means: "If 'the entity that began as a savings association' continues to exist as a separate entity." This makes sense. Prior to a specific transaction, it is unknown whether the savings

Subparagraph (A)'s second sentence suggests that Congress may have intended the second reference to "savings association" to mean the same thing as the first and third references: "the entity that began as a savings association." The second sentence not only contemplates the savings association not continuing to exist as a separate entity, it implies that the first sentence encompasses such a situation. If the first sentence did not encompass a situation in which the savings association ceased to exist as a separate entity, Congress could have simply stated "only a resulting savings association may retain and operate any existing branches and may establish and operate new branches." The second sentence demonstrates that when Congress wanted to refer to *resulting* savings associations, it modified the term "savings association" (as "continuing to exist as a separate entity") to explicitly indicate that intent.[27]

Finally, the States rely on both the Senate and Conference Committee reports as evidence that § 1823(k)(4) clearly proscribes banks' retention of former thrifts' offices.[28] Scrutiny of the reports, however, reveals the States' reliance is misplaced. As the RTC correctly noted during the rulemaking process, 55 Fed.Reg. 22,323, 22,325 (1990), the reports describe the effect of subparagraph (A)'s second sentence: savings associations that remain separate entities (as subsidiaries) are allowed to create new branches.[29] The reports provide no guidance as to what subparagraph (A)'s first sentence means.

■ In sum, because subsection (k)(4) does not clearly support the State's interpretation, we cannot conclude that Congress unambiguously expressed an intent that resulting banks may not retain existing thrift offices and operate them as bank branches.

## B. The RTC's Interpretation.

The RTC asserts that subparagraph (A)'s first sentence clearly means "a resulting entity may retain and operate any existing branch...." Again, we disagree. While it

---

association will become a bank and thereby lose its separate entity.

But if the third reference is interpreted as describing a resulting (post-transaction) savings association, the sentence reads: "If 'a resulting savings association' continues to exist as a separate entity." This is nonsense because *every* resulting savings association (thrift subsidiary) continues to exist as a separate entity.

**27.** The dissent argues that the State's "straightforward" interpretation of subsection (k)(4) "uses all the words, and only the words, that appear in the statute." Dissenting Opinion at 936, n. 10. In presenting this interpretation, however, the dissent is forced to creatively rephrase and explain what it believes the provision says. In describing subparagraph (A)'s first sentence, for example, the dissent says it "provides that if the savings and loan is the *survivor in a merger* or if it survives as *a separate entity* in a consolidation, transfer or acquisition, it may retain and operate its existing branches even though it may be owned by a bank holding company." *Id.* at 953 (emphasis added). The first sentence, however, never uses the terms "survivor" or "separate entity." As argued above, the *second* sentence employs that term when it wishes to refer to resulting savings associations. Moreover, in the next paragraph the dissent apparently contradicts its explanation by stating that a savings association cannot survive a merger. *Id.* at 936, n. 11.

The fact is, subsection (k)(4) is ambiguous, and any interpretation only espouses one viewpoint and then "explains" the provision's actual language in light of that viewpoint.

**28.** The Senate Report states:

> F. *Branching Restrictions on Certain Savings Associations*
> This section relaxes the branching restrictions applicable under section 408(m)(5) to a thrift subsidiary of a bank or bank holding company. Such a subsidiary will be able to branch to the same extent as a savings association that has its home office in the same State as the subsidiary does and is not affiliated with a bank holding company.

S.Rep. No. 19, 101st Cong., 1st Sess. 320 (1989).

The Conference Report essentially tracks this language, and provides that "[a] thrift subsidiary of a bank or bank holding company may branch in the same manner as a savings association (not affiliated with a bank holding company) that has its home office in the same state as the home office of such thrift subsidiary." H.R.Conf.Rep. No. 222, 101st Cong., 1st Sess. 398, *reprinted in* 1989 U.S.Code Cong. & Admin. News 432, 437.

**29.** As the Senate and Conference Committee reports suggest, this relaxes previous federal law, which did not allow a resulting savings association to establish and operate new branches. 12 U.S.C. § 1730a(m)(5)(A).

is possible that Congress intended this result, this construction requires even more gloss than does the States' construction. The plain language of the statute does *not* say "a *resulting bank* may retain existing branches." Such an interpretation requires replacing the term "savings association" with "resulting bank," a considerable interpretive leap. We do not believe that if Congress clearly intended "resulting bank" it would have said "savings association." Thus, subsection (k)(4) does not clearly provide that resulting banks may retain existing thrift offices and operate them as bank branches.

The RTC asserts in the alternative that subsection (k)(4) is silent with regard to whether resulting banks may retain and operate existing thrift offices as bank branches.[30] We agree that subsection (k)(4) is either silent or ambiguous on this question.[31] It certainly is not clear.[32]

## IV. *Chevron* Applied

■ The determination that § 1823(k)(4) is ambiguous does not affect our analysis of § 1823(k)(1). As discussed above in Section II, § 1823(k)(1) expresses a clear congressional authorization to override state law that creates a material impediment to emergency acquisitions. It would take equally unequivocal language in subsection (k)(4) to alter subsection (k)(1)'s express meaning. Subsection (k)(4) provides no such language. Under *Chevron*, we must "give effect to Congress's unambiguously

expressed intent," and that is "the end of the matter." 467 U.S. at 842–43, 104 S.Ct. at 2781–82. We hold that FIRREA authorizes the RTC to override state branch banking laws that preclude banks acquiring thrifts in emergency acquisitions to retain and operate the thrifts former offices as bank branches. As a result, we also hold that the Override Regulation is a valid exercise of the RTC's authority.

Even if we were to conclude that subsection (k)(1) is silent as to the specific issue of overriding state branch banking law, we would still uphold the RTC's interpretation of FIRREA. If subsection (k)(4) were silent, then *both* allegedly controlling provisions would be silent or ambiguous. Under *Chevron*, in the face of statutory ambiguity or silence, the question is whether the RTC's interpretation is permissible. *Id.* There may be *other* permissible interpretations of FIRREA. In fact, the RTC's interpretation may not be the "reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843, n. 11, 104 S.Ct. at 2782, n. 11. That is irrelevant. We would only overturn the Override Regulation if the *RTC's* interpretation is impermissible.[33]

The standard for determining permissibility depends on whether we find FIRREA's grant of rulemaking authority explicit or implicit. If "Congress has explicitly left a gap" for the RTC to fill, then this

---

**30.** The RTC discussed and allowed for this possibility in the rulemaking process. 55 Fed.Reg. 22,323, 22,325 (1990) (to be codified at 12 C.F.R. § 1611.1).

**31.** In this case, the intractable ambiguity effectively results in congressional silence.

**32.** We could entertain endless arguments defending alternate interpretations of subsection (k)(4)'s ambiguous language, but we are satisfied that such an exercise would be unproductive. We need not search for clarity that does not exist.

**33.** In order to avoid according *Chevron* deference to the RTC, the dissent adopts the astonishing position that FIRREA's applicable provisions, including § 1823(k)(4), are "anything but ambiguous." Dissenting Opinion at 949. As of

today, nine federal judges have parsed FIRREA to determine whether the RTC is authorized to override state branch banking law. (In addition to the two district court, and three circuit court, judges that have considered the companion cases before us, *see Arkansas State Bank Comm'r v. Resolution Trust Corp.*, 911 F.2d 161 (8th Cir.1990) (divided panel reversing district court holding that rejected the Override Regulation)). Five have decided that the RTC is authorized to override state branch banking law, and four have decided that it is not. Both circuit court panels were divided. *Id.* at 175 (Heaney, dissenting). And, although both the Eighth and Tenth Circuits have upheld the Override Regulation, we do not fully agree as to *why* the Override Regulation should be upheld. *Id.* at 170–71. We think it more accurate to say that FIRREA's provisions, especially § 1823(k)(4), are "anything but clear."

court should give the Override Regulation "controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–44, 104 S.Ct. at 2781–83. However, if the legislative delegation to the RTC is only implicit, we overturn the Override Regulation if it is unreasonable. *Id.* at 844, 104 S.Ct. at 2782.

We find that the legislative delegation is explicit. In § 1441a(b)(12)(A), the RTC is explicitly given broad authority to "issue such rules, regulations, standards, policies, procedures, guidelines, and statements" as it "considers necessary or appropriate to carry out" its statutory purpose. Moreover, § 1823(k)(1) explicitly grants the RTC authority to provide the terms of emergency acquisitions despite any provision of state law.

Even if the rulemaking delegation were only implicit, however, the Override Regulation is nevertheless a permissible interpretation of FIRREA.[34] As set forth above in Section II, persuasive arguments support the RTC's interpretation. The Override Regulation is *more* than "reasonably related to the purposes of its enabling legislation," *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973); it is crucial to fulfilling the RTC's congressional mandate to resolve failed and failing thrifts through § 1823(k)'s enumerated acquisitions.

Moreover, the RTC did not issue the Override Regulation in haste, or without considerable deliberation. The rulemaking notices proposing and then adopting the regulation reflect careful consideration of the statutory authority for, and legal implications of, issuing the Override Regulation. *See* 55 Fed.Reg. 13,543; 55 Fed.Reg. 22,-323. "[P]ractical agency expertise is one of the principal justifications behind *Chevron* deference." *Pension Benefit Guaranty Corp. v. LTV Corp.*, — U.S. —, 110 S.Ct. 2668, 2679, 110 L.Ed.2d 579 (1990). In fact, the RTC's expert "judgments about the way the real world works

... are precisely the kind that agencies are better equipped to make than are courts." *Id.* We defer to this reasonable implementation of the RTC's congressional mandate.

## V. The McFadden Act

■ The States argue that the McFadden Act prevents the RTC from overriding state branch banking laws. Neither the McFadden Act's plain language nor its legislative history reveal such a restriction. The Comptroller of the Currency, charged with implementing the McFadden Act (also a party to this appeal), does not interpret the Act as restricting the RTC's emergency override authority. And, judging from subsequent legislation, neither does Congress. Finally, if we accepted the State's interpretation of FIRREA, it would violate the McFadden Act in the same way that the Override Regulation allegedly does.

The McFadden Act's relevant language provides:

(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches ... at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.

12 U.S.C. § 36(c).

The Act's plain language confers authority on the Comptroller to approve national bank branches to the extent allowed by state branching restrictions. The Act does not state that the Comptroller possesses the *sole* authority to approve national bank branches. It does not limit Congressional authority to override state branching law. Nor does the Act address the proper disposition of branches resulting from emergency acquisitions. In fact, the McFadden Act

---

**34.** Since the Override Regulation is reasonable, it is not, *a fortiori*, "arbitrary, capricious, or manifestly contrary" to FIRREA.

does not contemplate emergency acquisitions, or their attendant complications.

The Supreme Court reviewed the legislative history of the McFadden Act and concluded that "Congress intended to place national and state banks on a basis of 'competitive equality' insofar as branch banking was concerned." *First Nat'l Bank of Logan v. Walker Bank & Trust Co.*, 385 U.S. 252, 261, 87 S.Ct. 492, 497, 17 L.Ed.2d 343 (1966), *reh'g denied*, 385 U.S. 1032, 87 S.Ct. 738, 17 L.Ed.2d 680 (1967). The Act struck a compromise by "maintaining restraints on national banks' branching while allowing them just enough flexibility to compete with state banks...." *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 414, 107 S.Ct. 750, 764, 93 L.Ed.2d 757 (1987) (Stevens, J., concurring).

The Override Regulation does not subvert the McFadden Act's objective of protecting competitive equality between state and national banks because it applies equally to both state and national banks. If the Regulation is applied in a particular state, both state and national banks may acquire and operate existing thrift offices. And neither state nor national banks may create new branches in violation of state law. The Regulation protects their competitive equality.

In contrast, the States' interpretation of the McFadden Act would effectively subvert competitive equality. Even if, as the States assert, the McFadden Act is interpreted as preventing the override of state law as applied to *national* banks, the Act could not prevent the RTC override of state law as applied to *state* banks because McFadden only governs *national* banks.[35] Thus, the Override Regulation would have the bizarre effect of requiring national banks to follow state branching restrictions that the state banks were not required to follow. Such an interpretation of the McFadden Act directly subverts the Act's declared purpose.

The Comptroller of the Currency supervises national banks and is responsible for administering the McFadden Act. *See* 12 U.S.C. §§ 1, 26, 27(b)(2), 36(c).

It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the meaning of these laws. *See First National Bank v. Missouri*, 263 U.S. 640, 658 [44 S.Ct. 213, 215, 68 L.Ed. 486 (1924)].

*Clarke v. Securities Indus. Ass'n*, 479 U.S. at 403–04, 107 S.Ct. at 759–60 (quoting *Investment Co. Inst. v. Camp*, 401 U.S. 617, 626–27, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971)).

The Comptroller has taken the position that the Override Regulation does not violate, or even implicate, the McFadden Act. Brief for Appellee Comptroller of the Currency at 7. For the reasons given above, his interpretation supports competitive equality. Since the Comptroller's interpretation is reasonable, this court should give it "great weight."

Congress has provided, in subsequent legislation, further support for the RTC's (and Comptroller's) interpretation of the McFadden Act. The Depository Institutions Act of 1982, Pub.L. No. 97–320, 96 Stat. 1469 ("Garn—St. Germain Act") provides branching authority for national banks quite separate from that contained in the McFadden Act.

The provision, codified at 12 U.S.C. § 1823(f), authorizes emergency acquisitions of insured banks in default by an

---

**35.** It is beyond dispute that, in the absence of a federal limitation on preemption, federal law preempts conflicting state law. *New York v. FCC*, 486 U.S. 57, 64, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48 (1988) ("The statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof."); *Lincoln Sav. and Loan Assoc. v. Federal Home Loan Bank Bd.*, 856 F.2d 1558, 1560 (D.C.Cir.1988) ("So long as an agency has statutory authority to issue regulations, those regulations will preempt inconsistent state statutes by the simple operation of the Supremacy Clause."); *see also Federal Deposit Insurance Corp. v. Bank of Boulder*, 911 F.2d 1466, 1472 (10th Cir.1990).

out-of-state bank, and provides, at subparagraph (4)(B), that acquiring banks may "retain and operate any existing branch or branches of the institution merged with or acquired ... but otherwise shall be subject to the conditions upon which a national bank may establish and operate branches in the State in which such insured institution is located." Without reference to the McFadden Act, or the Comptroller of the Currency, this provision authorizes national bank branching through emergency acquisitions.

This provision is not an exception to the McFadden Act. To the contrary, it demonstrates that the McFadden Act does not need to be excepted. Congress did not refer to the McFadden Act in its subsequent legislation because McFadden does not address, let alone preclude, override of state law for the purposes of facilitating emergency transactions. As the Comptroller persuasively argues:

> [w]hile the McFadden Act confers routine authority on the Comptroller to approve national bank branches, the relevant provision of FIRREA, 12 U.S.C. 1823(k), is an emergency grant of power to a temporary, specialized federal agency charged with disposing of the assets of failed and failing thrifts. Therefore, the state law limitations incorporated by reference in the McFadden Act simply do not apply to the RTC's emergency authority under FIRREA.

Brief for Appellee Comptroller of the Currency at 7.

The States provide, perhaps unwittingly, the best argument against their interpretation of the McFadden Act in their interpretation of § 1823(k)(4). The States claim, as discussed above, that subsection (k)(4) *prohibits* banks from retaining and operating as bank branches the thrift offices they obtain in an emergency acquisition. But approximately half of the states do not restrict branch banking, and would allow banks to retain and operate as bank branches the thrift offices they obtained in an emergency acquisition. In those states, FIRREA would override state branch banking law by imposing branching restrictions that the states did not enact.[36] Thus, the States' own interpretation of FIRREA falls victim to the same violation of McFadden allegedly committed by the Override Regulation.

In reality, the McFadden Act neither contemplates nor addresses the emergency transactions authorized in § 1823(k). The Override Regulation does not violate either the letter or the spirit of the McFadden Act. To the contrary, the Override Regulation preserves McFadden's motivating principle of competitive equality between state and national banking institutions.

## VI. The Regulatory Flexibility Act

██ The States next argue that the RTC failed to comply with the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601–612. The RFA requires all agencies, as part of the rulemaking process, to conduct a "regulatory flexibility analysis" for their proposed rules. 5 U.S.C. §§ 603–604. In the analysis, the agency must evaluate how the proposed rule will affect small entities, consider alternatives that would "minimize any significant economic impact of the rule on [such] entities," and explain "why each one of such alternatives was rejected." 5 U.S.C. § 604(a)(3). *See also* 5 U.S.C. § 603(a), (c). The agency does not, however, have to prepare a flexibility analysis "if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). If the agency certifies, the RFA directs the agency to publish the certification in the Federal Register with the general notice of proposed rulemaking or at the time the final rule is published. The agency must also publish a succinct statement explaining the reasons for the certification. *Id.*

---

**36.** The States might respond by insisting that their interpretation of subsection (k)(4) is that it prohibits resulting banks from retaining and operating thrift offices as bank branches *unless* such branching is allowed by state law. But such an interpretation would only bring them further afield of the "actual language" of subsection (k)(4), which includes no such relaxation, and on which they place great emphasis.

The States argue that the RTC violated the RFA in certifying that the Override Regulation would not significantly affect a substantial number of small entities. They assert that the RTC had no basis for certification, and failed to publish a succinct statement explaining its rationale. We disagree.

First, the RTC did publish a statement explaining its certification. In its notice of a final rule, the RTC explained:

The basis for the RTC's certification is its determination that the rule will not impose compliance requirements on depository institutions of any size. It imposes no performance standards, no fees, no reporting or recordkeeping criteria, nor any other type of restriction or requirement with which depository institutions must comply. Thus, it does not have the type of economic impact addressed by the RFA.

55 Fed.Reg. 22,323, 22,327 (1990) (to be codified in 12 C.F.R. § 1611.1). The statement presents a valid basis for certification. The RFA is meant to address "the high cost to small entities of compliance with uniform regulations." *Mid–Tex Elec. Co-op., Inc. v. F.E.R.C*, 773 F.2d 327, 342 (D.C.Cir.1985) (analyzing 5 U.S.C. § 605). For purposes of flexibility analysis, "the relevant 'economic impact' [i]s the impact of compliance." *Id.* The Override Regulation imposes no regulatory compliance requirements.

Second, by the terms of the RFA, an agency's decision to certify is not subject to judicial review. 5 U.S.C. § 611;[37] *see also Thompson v. Clark*, 741 F.2d 401, 404–08 (D.C.Cir.1984); *Michigan v. Thomas*, 805 F.2d 176, 188 (6th Cir.1986). This does not mean that an agency may disregard completely the RFA's requirements, or "ignore with impunity the effect of its rules upon small entities." *Thompson v. Clark*, 741

F.2d at 408. "[T]he agency's decision may still be overturned because of an analysis so defective as to render its final decision unreasonable, or, in the absence of any analysis, because of a failure to respond to public comment concerning the rule's impact on small entities." *Michigan v. Thomas*, 805 F.2d at 188 (citing *Thompson v. Clark*, 741 F.2d at 408).

Such is not the case here. The RTC's certification was proper. Moreover, the RTC carefully addressed the sole public comment that challenged its certification. 55 Fed.Reg. 22,323, 22,327 (1990). Therefore, we cannot say that certification under the RFA rendered the Override Regulation unreasonable.

For the foregoing reasons, we hold that FIRREA authorizes the RTC to override state branch banking laws that would preclude banks that obtain failed or failing thrifts through emergency acquisitions to retain and operate the thrifts' offices as bank branches. To the extent that FIRREA is either ambiguous or silent on this question, we uphold the RTC's interpretation, formalized in the Override Regulation, as a reasonable construction of the statute. Furthermore, the Override Regulation violates neither the McFadden Act, nor the Regulatory Flexibility Act.

Accordingly, we REVERSE the judgment of the Colorado district court, and AFFIRM the judgment of the New Mexico district court.

EBEL, Circuit Judge, dissenting:

I must respectfully dissent. After applying the traditional rules of statutory construction to 12 U.S.C. § 1823(k)(1) & (k)(4), I find these statutory provisions to be unambiguous and the RTC's interpretation of them to be incorrect. The RTC is not entitled to substantial deference with respect to its interpretation. Furthermore, the

---

**37.** 5 U.S.C. § 611 states:

(a) Except as otherwise provided in subsection (b), any determination by an agency concerning the applicability of any of the provisions of this chapter to any action of the agency shall not be subject to judicial review.

(b) Any regulatory flexibility analysis prepared under sections 603 and 604 of this title

and the compliance or noncompliance of the agency with the provisions of this chapter shall not be subject to judicial review. When an action for judicial review of a rule is instituted, any regulatory flexibility analysis for such rule shall constitute part of the whole record of agency action in connection with the review.

RTC's interpretation is unacceptable under any standard of review.

## Standard of Review

The substantial deference standard of review discussed in *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and its progeny is not implicated in this case. We are to afford an administrative agency substantial deference in its interpretation of Congressional authority *only* if we find the relevant authority to be ambiguous. Before we find an ambiguity, however, we must first employ the traditional rules of statutory construction to aid us in discerning the Congressional intent:

> The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.... If a court, *employing traditional tools of statutory construction,* ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*Id.* at 843 n. 9, 104 S.Ct. at 2782 n. 9.

The Court subsequently reaffirmed this principle in *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446–47, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987) (rejecting an INS construction of the Refugee Act of 1980 by "[e]mploying traditional tools of statutory construction"). *See also NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987) ("On a pure question of statutory construction, our first job is to try to determine congressional intent, using 'traditional tools of statutory construction.' If we can do so, then that interpretation must be given effect, and the regulations at issue must be fully consistent with it."). Therefore, the deference principle upon which the RTC bases its argument only applies if we find the applicable provisions to be ambiguous *after applying the traditional tools of statutory construction.*[1] After applying the tools of statutory construction, I find the applicable provisions to be anything but ambiguous.

## McFadden Act

The analysis must begin with the McFadden Act, 12 U.S.C. § 36. The McFadden Act reads in pertinent part:

> The conditions upon which a national banking association may retain or establish and operate a branch or branches are the following:
>
> .    .    .    .    .
>
> A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches ... at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not

---

1. Furthermore, the RTC in promulgating the Override Regulation arguably violated a Presidential Executive Order:

> By the authority vested in me as President by the Constitution and laws of the United States of America, and in order to restore the division of governmental responsibilities between the national government and the States that was intended by the Framers of the Constitution and to ensure that the principles of federalism established by the Framers guide the Executive departments and agencies in the formulation and implementation of policies, it is hereby ordered as follows:
>
> .    .    .    .    .

(4) Special requirements for Preemption

.    .    .    .    .

> (b) Where a Federal statute does not preempt State law (as addressed in subsection (a) of this section), Executive departments and agencies shall construe any authorization in the statute for the issuance of regulations as authorizing preemption of State law by rule-making only when the statute expressly authorizes issuance of preemptive regulations or there is some other firm and palpable evidence compelling the conclusion that the Congress intended to delegate to the department or agency the authority to issue regulations preempting State law.

Exec. Order No. 12612, 52 Fed.Reg. 41685 (1987).

merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.

12 U.S.C. 36(c).

Section 36(c) permits national banks to establish branches if such branches could be established by state banks under state law. *First Nat'l Bank of Logan v. Walker Bank and Trust Co.*, 385 U.S. 252, 260, 87 S.Ct. 492, 496, 17 L.Ed.2d 343 (1966). Section 36(c) is the cornerstone branching authority for national banks and represents a Congressional "response to the competitive tensions inherent in a dual banking structure where state and national banks coexist in the same area." *First Nat'l Bank in Plant City v. Dickinson*, 396 U.S. 122, 131, 90 S.Ct. 337, 342, 24 L.Ed.2d 312 (1969).

The RTC interpretation of § 1823(k)(1) & (k)(4) is in direct conflict with the McFadden Act because the RTC reads those provisions to permit branch banking in circumstances under which the McFadden Act would prohibit it. One of the fundamental cannons of statutory construction that we must consult before deferring to the RTC's "interpretive expertise" is that "[a]mendments by implication, like repeals by implication, are not favored." *United States v. Welden*, 377 U.S. 95, 102 n. 12, 84 S.Ct. 1082, 1087 n. 12, 12 L.Ed.2d 152 (1964). *See National Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 317–18 (D.C. Cir.1988). *See also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1017, 104 S.Ct. 2862, 2880, 81 L.Ed.2d 815 (1984) (partial repeal by implication is disfavored). Admittedly, the Congress could provide an alternative authority for national bank branching allowing national banks to operate branches in states where state laws prohibit state banks from operating branches. But, whether codified as a separate statute or as a modification of the McFadden Act itself, the result would be the same—such an action would constitute an amendment of the McFadden Act.[2] Therefore, the RTC's Override Regulation, based upon a purported amendment of the McFadden Act by implication, is unacceptable.[3]

The RTC's interpretation of § 1823(k) also violates a second cannon of statutory construction: "[W]here there is no *clear* intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987) (quotation omitted) (emphasis in the original). Here, the RTC seeks to rely primarily on the general language of § 1823(k)(1) to override the very specific language of the McFadden Act, which unequivocally and directly prohibits federal branch banking in states where state branch banking is not allowed. I do not believe that it is too much to ask that when and if Congress decides to amend a fundamental sixty-three year-old banking statute that it should do so explicitly. These two canons of statutory construction lead me to conclude that § 1823(k) does not, in any manner, authorize branch banking in a way that otherwise is clearly prohibited by the McFadden Act. Thus, I would never reach the point of relying on the RTC's interpretation of these provisions.

### *Section 1823(k)(1)(A)(i)*

Putting aside for a moment the McFadden Act, it seems to me that the RTC's interpretation of § 1823(k)(1)(A)(i) by itself is flawed.[4] Section 1823(k)(1)(A)(i) begins

---

**2.** The thought that the legislative wellspring for a regulation of the magnitude of the Override Regulation would be buried four organization levels within a section of the code entitled Corporation Monies is certainly troubling. Perhaps the real problem is that if statutory interpretation can legitimately be based upon isolated subsections of a statutory scheme that spans 1106 pages of the United States Code, one could find support for an unimaginable number of agency actions.

**3.** *Cf.* 12 U.S.C. § 36(c) where federal branch banking is authorized only where it is "authorized to state banks by the statute law of the state in question by language specifically granting such authority affirmatively *and not merely by implication....*" (emphasis added).

**4.** Expanding § 1823(k)(1)(A)(i)(I) to reach state branch banking laws strains credulity—especially since § 1823(k) actually contains a subsection that directly addresses branch banking.

with a phrase that is relied upon heavily by the RTC: "Notwithstanding any provision of State law...." This phrase, however, does not exist in a vacuum—it exists in a particular location within § 1823. It grammatically modifies just the three subparts that fall directly beneath it (I, II and III). When read together, § 1823(k)(1)(A)(i)(I–III) reads:

Notwithstanding any provision of State law ... the Corporation ... may authorize—

(I) a savings association ... to merge or consolidate with, or to transfer its assets and liabilities to, any other savings association or any insured bank,

(II) any other savings association to acquire control of such savings association, or

(III) any company to acquire control of such savings association or to acquire the assets or assume the liabilities thereof.

Section 1823(k)(1)(A)(i)(I) allows the RTC to override any state law that precludes a merger of a savings and loan with a bank. That would include any state law that straight out precludes such mergers—and that was undoubtedly the main purpose behind this statutory provision. We are not confronted here with any such law in Colorado or New Mexico. Section 1823(k)(1)(A)(i)(I) would also, presumably, override state laws which apply so onerously to a merger transition between a bank and a savings and loan that they effectively preclude such a merger. Such laws might be, for example, laws that harshly tax such transactions or that impose other restrictions that materially *disadvantage* such a merged entity. Here, however, by circumventing the McFadden Act, the RTC is seeking not to remove a disadvantage, but rather is seeking a competitive *advantage* over all other federal and state banks in Colorado and New Mexico—an advantage that it hopes to turn into cash. I cannot believe Congress intended to give the RTC such power, particularly via the tortured and subtle inferences upon which the RTC relies.

In any event, the RTC's reliance upon the "notwithstanding any provision of state law" language in support of the Override Regulation is misplaced. It is not state law that prohibits these federal banks, which are the subject of the instant litigation, from operating with branches; it is *federal law* (the McFadden Act) that prohibits them from so operating. The McFadden Act incorporates by reference state branch banking laws *governing state banks.* Therefore, it is the McFadden Act that requires uniformity between the way federal and state banks may operate insofar as branching is concerned. There is absolutely nothing in the language of § 1823(k)(1)(A)(i)(I) that gives the RTC the authority to override federal law.[5]

The State's interpretation of (k)(1) will not lead to any inequality between federal and state banks that may desire to take over a failed savings and loan that has branch locations. If the state prevents state bank branching, then a state bank could not maintain the branches of the acquired savings and loan as separate bank branches. Nothing in (k)(1) authorizes the RTC to override that particular state law. Similarly, if a federal bank acquired such a savings and loan, the McFadden Act would prevent it from maintaining the branches as bank branches. Nothing in (k)(1) overrides the McFadden Act. Thus, there is complete equality between federal and state banks, and the choice of whether to

The effect of the RTC's analysis is to give a subsection of § 1823(k) that does not explicitly address the topic of branch banking—(1)(A)(i)(I)—more weight than the subsection that explicitly addresses branching—(4)(A).

**5.** I find little persuasive value in the fact that Congress enacted subsections (vi) to (k)(1)(A) that prevents an override of state laws restricting activities of a savings association on behalf of another entity. The fact that Congress specif-

ically chose to prohibit one particular form of override of state law does not mean that it intended to authorize override of other provisions. To the contrary, it appears that (k)(1)(A)(vi) provides additional support for the principles of federalism by allowing states to pass laws preventing banks or other entities from circumventing state laws by transacting business through "sham" savings and loan institutions.

allow banks to maintain branches is left to the states, as the McFadden Act intended. See *State of Utah ex rel., Department of Financial Institutions v. Zions First National Bank of Ogden, Utah,* 615 F.2d 903, 906 (10th Cir.1980), where this court construed the McFadden Act as guaranteeing States the right to determine "when, where and how, a national bank may branch, if indeed it may branch at all."

Further, in order to sustain its position, the RTC is forced to advance a novel and most peculiar definition of the term merger that includes within its scope the operation of the surviving entity after the merger actually occurs. The RTC is forced to take the position that any state laws that materially affects the resultant entity's operation *after* the merger is one which could be considered to preclude the underlying merger or consolidation. Under the RTC's definition, if the surviving entity is forced to divest itself of any of the holdings of the merged entity or even if it is forced to operate any of the merged holdings in a different way, that transaction is not, therefore, a merger. The RTC can point to no authority supporting this expansive definition of merger. The ordinary and standard definition of merger has to do only with the form of the legal joinder of two entities, not with the way the surviving entity is subsequently operated. *Black's Law Dictionary* defines merger of corporations as:

> An amalgamation of two corporations pursuant to statutory provision in which one of the corporations survives and the other disappears. The absorption of one company by another, the former losing its legal identity, and latter retaining its own name and identity and acquiring assets, liabilities, franchises, and powers of former,[6] and absorbed company ceasing to exist as separate business entity.

*Black's Law Dictionary* 988 (6th ed. 1990) (footnote added). *See also* 15 *W. Fletcher, Cyclopedia of the Law of Private Corporations* § 7041 (rev. perm. ed. 1990). The RTC's unique definition of merger has no support in the caselaw. *See, e.g., United States v. Connecticut Nat'l Bank,* 418 U.S. 656, 659, 94 S.Ct. 2788, 2791, 41 L.Ed.2d 1016 (1974) (bank merger viewed as a merger even though the banks intended to divest themselves of a number of branch offices); *Reibert v. Atlantic Richfield Company,* 471 F.2d 727, 728 (10th Cir.), *cert. denied,* 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973) (viewing the transaction as a merger even though the surviving entity "was forced to divest itself of all marketing properties in the Northeastern and Southeastern states."). Indeed, to make matters worse, even if there was support for the RTC's anti-divestiture definition of the term merger, this definition would have no application in this case. A state law prohibiting a bank from operating former savings and loan branches as bank branches does not work a divestiture. The bank is not required to disgorge any of the customer deposits or other financial assets—the law simply prohibits it from operating the former savings and loan branch offices as bank offices.[7]

The RTC argues that the post-merger operating restriction on branch banking may render the target savings and loan so unattractive as to destroy its value as a merger candidate. There are several problems with this argument. First, it is simply unsupported in the record. Second, the ability to operate *bank* branches is not an asset that the savings and loan had in the first place. Because the savings and loan never had such a right or interest to sell, it does not *diminish* the value of the savings and loan to prohibit a successor bank from operating its savings and loan branches as bank branches. Such a restriction only

---

**6.** As pointed out, *infra,* an absorbed savings and loan had the power to maintain savings and loan branches prior to the merger and that power may unquestionably be passed on to the acquiring bank to maintain savings and loan branches. It never had the power to maintain *bank* branches, and hence it could not pass such a right on to the surviving bank.

**7.** The bank could service the savings association's branch accounts at the former savings and loan branch locations by incorporating each location as a separate bank and by meeting the bank capital requirements at each location.

forecloses an *enhancement* of the value of the savings and loan. Of course, the value of a savings and loan could be enhanced in many ways if a bank could somehow acquire immunity from state laws by the expediency of purchasing a savings and loan. But absolutely nothing in § 1823(k)(1)(A)(i)(I) gives the RTC the power to sell not only a failed savings and loan but also to create new dispensations from state law that may be appended to the savings and loan to enhance its value. The RTC has suggested no limit to its power to create dispensations from state law other than its suggestion that we trust it not to abuse this power. What if the RTC decides that a savings and loan will have more value as a merger candidate if it can bestow immunity to its merger partner from state zoning laws, or pollution laws, or Sunday closure laws? May the RTC abrogate those state laws too? There is absolutely nothing in the way the RTC reads its authority under § 1823(k)(1) that would limit its power to override those laws as surely as it claims power to override state bank branching laws. Under the RTC's interpretation of § 1823(k)(1)(A)(i)(I), it has the power (though it assures us it would not use it) to vitiate *all* state laws that would make a failed savings and loan a less attractive merger candidate.

Congress could not have intended to give the RTC such sweeping powers so contrary to the McFadden Act and basic principles of federalism. Although the RTC clearly has the desire and intent to acquire such powers, we must keep in mind that it is *Congressional* intent—not the RTC's intent—[8] that we are seeking to determine. It seems clear to me that Congress did not intend to give the RTC such sweeping pow-

ers and certainly nothing in § 1823(k) explicitly gives it such powers.[9]

### Section 1823(k)(4)

The other statutory provision the RTC cites is § 1823(k)(4)(A). Section 1823(k)(4)(A) is, in fact, the most relevant portion of FIRREA because it is the only provision that deals explicitly with branch banking. Section 1823(k)(4)(A) reads in pertinent part:

> If a merger, consolidation, transfer, or acquisition under this subsection involves a savings association eligible for assistance and a bank or bank holding company, a *savings association* may retain and operate any existing branch or branches or any other existing facilities. If the savings association continues to exist as a separate entity, it may establish and operate new branches to the same extent as any savings association that is not affiliated with a bank holding company and the home office of which is located in the same State. (emphasis added).

By its terms, this section appears to provide independent authority to maintain branches in only two situations. The first sentence provides that if the savings and loan is the survivor in a merger or if it survives as a separate entity in a consolidation, transfer or acquisition, it may retain and operate its existing branches even though it may be owned by a bank holding company. The second sentence provides that if, after a merger, consolidation, transfer or acquisition, the savings and loan continues to exist as a separate entity, it may open new branches to the same extent as a savings and loan that is not affiliated

---

**8.** The intent of the RTC and the Comptroller of the Currency is clear. They hope to achieve through the unfortunate savings and loan crisis something that they have never been able to persuade Congress to do forthrightly—to vitiate and override federal law prohibiting branch banking by national banks in states where branch banking by state banks is prohibited. *See Arkansas State Bank Comm'r v. Resolution Trust Corporation*, 911 F.2d 161, 177 (8th Cir. 1990) (Heaney, J., dissenting).

**9.** Although the majority argues that these examples are farfetched, it might actually be easier to argue that the RTC has the power to override state zoning, pollution, and sunday closure laws that it would be to justify the RTC's power to authorize federal branch banking in states where branch banking is prohibited. This is because Congress has expressly addressed branch banking, both in the McFadden Act and in § 1823(k)(4), whereas it has not sought explicitly to preserve state authority in these other areas.

with a bank holding company.[10] This interpretation is straightforward; it gives meaning to every word; it does not violate any defined terms; it does not conflict with the McFadden Act; and it makes sense. Because this section only expressly authorizes branches to be maintained when they are operated by a surviving savings and loan entity, a negative implication may be drawn that Congress did not intend banks to be able to maintain branches if to do so would violate the McFadden Act.

The RTC contorts this section to provide support for the Override Regulation by pretending that if a savings association merges into a bank, the second reference to "savings association" in the first sentence refers to the surviving bank that has absorbed the savings association as a result of the merger.[11] However, this gives the term "savings association" a meaning that is statutorily proscribed.[12] In 12 U.S.C. § 1813(b), Congress defined savings association as follows:

The term "savings association" means—

(A) any Federal savings association

(B) any State savings association; and

(C) any corporation (*other than a bank*) that the Board of Directors and the Director of the Office of Thrift Supervision jointly determine to be operat-

ing in substantially the same manner as a savings association. (emphasis added).

Thus, Congress has specifically precluded the definition of "savings association" that the RTC now advances.[13]

### Legislative History

The legislative history also undermines the RTC's interpretation of (k)(1) and (k)(4). During the floor debates, Senator Wirth specifically asked Senator Riegle, the chairman of the Senate Banking Committee, whether the FIRREA conversion transaction provisions—including the (k)(4) emergency transaction—would permit the RTC to circumvent the McFadden Act. Senator Riegle assured him that they would not:

MR. WIRTH: Mr. President, I seek recognition to inquire about certain provisions contained in the Savings and Loan Conference Report. I would like to ask the distinguished Chairman of the Banking Committee, Senator Riegle, to clarify provisions in the legislation concerning the conversion of thrift charters to bank charters.

Is it correct that the provisions of this act that permit thrifts to be converted to banks are not intended to allow banks resulting from such conversions to estab-

10. The RTC argues that the second sentence, which begins with "If the savings association continues," implies that the first sentence deals with a situation where the savings and loan does not continue as a separate entity following the merger. I do not find this argument persuasive. The plain language of the first sentence simply provides that the savings association may *retain* and operate the pre-transaction branches and the second sentence then provides that the savings association may *establish* and operate *new* branches *notwithstanding* the fact that it may be owned by a bank or may not have its home office in the state where the branches are located. This is the only interpretation that does not violate the definition of savings association provided by Congress and that uses all the words, and only the words, that appear in the statute. *See infra* note 12 & accompanying text.

11. This reference cannot refer to the former savings association because as the majority notes, after a merger "the less important ceases to have an independent existence." *Blacks Law Dictionary* at 988.

12. The RTC's reliance upon the "conditional if" in the second sentence in interpreting the first

reference to savings association is troubling for still another reason. The second sentence was added when Congress enacted § 1823(k)(4) to replace § 1730a(m)(5). Because the first sentence predated the second sentence, we cannot rely on the second sentence as an interpretative guide for the meaning of the first sentence when it was first enacted. And there is absolutely nothing in the legislative history to suggest that Congress intended the narrowly-drawn second sentence to result in such a far-reaching amendment to the first sentence and to the McFadden Act. *See infra* n. 14 & accompanying text.

13. The RTC makes the disingenuous argument that if a savings association merges into a bank, "the second reference to 'savings association' [in the first sentence] [can] ... be read as 'the entity that the savings association becomes.'" Unfortunately for the RTC, in this type of merger the entity that the savings association becomes is a bank, and the definitional statute specifically says that a bank cannot be a savings association.

lish, retain, maintain, or operate branches that do not comply with the laws relative to the establishment and operation of bank branches or offices in the respective States where such banks are located?

MR. RIEGLE: The Senator's statement is correct.

135 Cong.Rec. S10,200 (daily ed. August 4, 1989). Congressman Leach of the House Banking Committee agreed with this assessment:

> As for specific provisions of the conference report, the record should be clear on the following items:
>
> First, that provisions of this act that permit thrifts to be converted to thrifts [sic.] [banks] are not intended to allow banks resulting from such conversions to establish, retain, maintain, or operate branches that do not comply with the laws relative to establishment and operation of bank branches or offices in the respective States where such banks are operated. *In other words, the Douglas or McFadden Acts are not intended to be circumvented by this statute.*

135 Cong.Rec. H4980 (daily ed. August 3, 1989) (emphasis added).

The majority argues that these "passing comments" and "casual statements" are not authoritative. Nonetheless, the Supreme Court in *Chevron U.S.A.*, a case upon which the majority heavily relies, frequently cited to key portions of relevant floor debate in order to discern legislative intent. *Chevron U.S.A.*, 467 U.S. at 852–53 & n. 25, 104 S.Ct. at 2786–87 & n. 25. Even the House Conference Committee Report, which as the majority notes is the "authoritative source for finding the Legislature's intent," suggests that the RTC's interpretation is incorrect. The Conference Report states that:

> The acquisition of failing thrifts by banks or bank holding companies is authorized. A thrift subsidiary of a bank

or bank holding company may branch in the same manner as a savings association (not affiliated with a bank holding company) that has its home office in the same state as the home office of such thrift subsidiary.

H.R.Conf.Rep. No. 101–222, 101st Cong., 1st Sess. 398, reprinted in 1989 U.S.Code Cong. & Admin.News 432, 437. There would have been no reason to limit the discussion of authorized branches in this report to a *thrift subsidiary* if banks could directly retain and establish branches in their own names in contravention of the McFadden Act.[14]

After applying the well-established rules of construction, I reach the conclusion that § 1823(k)(4)(A) clearly and unambiguously does not allow banks to use the branches of acquired savings and loans as bank branches in violation of the McFadden Act. This reading of the statutes in question is further bolstered by the long-established policies of the McFadden Act and by the legislative history of FIRREA. From all quarters it seems to me that the RTC has taken an indefensible position. Therefore, I DISSENT.

---

**14.** The majority argues that the Conference Committee Report is inapposite because it only addresses the second sentence of § 1823(k)(4)(A), which was added as an amendment to the precursor statute, § 1730a(m)(5)(A). I disagree. It is clear that the Conference Committee Report is a summary of § 1823(k)(4)(A) in its entirety. For example, the first sentence ("The acquisition of failing thrifts by banks or bank holding companies is authorized.") was true under § 1730a(m)(5)(A) as well.